IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LUCKY LINCOLN GAMING, LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 1:23-cv-16664 |
| FATMIR DIKENOSKI, | ) ) |
| Defendant. | ) ) ) |

**COMPLAINT**

NOW COMES the Plaintiff, Lucky Lincoln Gaming, LLC ("LLG"), by and through its attorneys, Odelson, Murphey, Frazier & McGrath, Ltd., for its Complaint against the Defendant, Fatmir "Fabio" Dikenoski ("Dikenoski" or "Defendant"), states as follows:

**PARTIES AND JURISDICTION**

1. Lucky Lincoln Gaming, LLC ("LLG") is an Illinois limited liability company incorporated under the laws of the State of Illinois and has its principal place of business at 3945 N. Neenah Ave., Chicago, Illinois 60642.

2. Fatmir Dikenoski is a former sales consultant for LLG who now resides in the State of Florida.

3. This Court has diversity jurisdiction over the parties because the parties are citizens of different States and the amount in controversy exceeds the value of $75,000. *See* 28 U.S.C. § 1332(a).

4. This Court is a proper venue for this case because: (1) LLG has its principal place of business in the City of Chicago and does business in or around the Chicagoland area; (2) Dikenoski consented to adjudicate all disputes arising from the contractual agreement between Dikenoski and

1

LLG in federal court in the State of Illinois for any dispute involving his consultancy with LLG in accordance to the Consulting Agreement he entered into with LLG; (3) the parties entered into the Consulting Agreement in this judicial district; and (4) a substantial part of the events or omissions giving rise to this action took place in this judicial district. *See.* 28 U.S.C. § 1391(b)(2).

## RELEVANT FACTS

5. LLG is licensed by the Illinois Gaming Board ("IGB") as a Video Gaming Terminal Operator ("Terminal Operator") under the Illinois Video Gaming Act, 230 ILCS 40/1, *et seq*.

6. LLG has been licensed by the Illinois Gaming Board since April 2014.

7. Since the passage of the Video Gaming Act, terminal operators, like LLG, have provided video gaming terminals to establishments such as bars, truck stops, restaurants, and other entities with liquor licenses.

8. Since April 2014, LLG has grown into the fifth largest terminal operator in Illinois, with over 220 locations and operating close to 1,300 videogaming terminals.

9. As a licensed Terminal Operator, LLG has invested millions of dollars in its business operations which in turn have generated millions of dollars of purchasing infrastructure, payroll and tax revenue.

10. LLG employs a team of sales consultants who are responsible in obtaining signed Use Agreements with potential licensed establishments that are deemed a "qualified location" as defined by the Video Gaming Act.

11. The Illinois Gaming Board defines the term "Use Agreement" as "[a] contractual agreement between a licensed terminal operator and a licensed video gaming location establishing terms and conditions for placement and operation of video gaming terminals by the licensed

terminal operator within the premises of the licensed video gaming location." 11 Ill. Adm. Code 1800.110; *see also J & J Ventures Gaming, LLC v. Wild, Inc.*, 2015 IL App (5th) 140092, ¶ 45.

12. The Video Gaming Act and rules promulgated by the Illinois Gaming Board prohibit terminal operators, including its agents acting on behalf of terminal operators, from giving anything of value to a video gaming establishment as an incentive or inducement to locate their machines in that establishment. 230 ILCS 40/25(c); *see also* 11 Ill. Adm. Code 1800.350.

13. On or about December 21, 2017, Fatmir Dikenoski and LLG entered into a Consulting Agreement for Dikenoski to act as a sales consultant on behalf of the company. A true and accurate copy of the Consulting Agreement is attached hereto as **Exhibit A**.

14. Pursuant to the terms and conditions of the Consulting Agreement, Dikenoski agreed he would not offer inducements of any kind to establishments to enter into a Use Agreement with LLG. *See* **Exhibit A**, ¶ 5.

15. Jeff Rehberger Jr. is the founder of LLG and acted as President of the company during the relevant time period when Dikenoski acted as a sales consultant for LLG.

16. At the start of his tenure as a sales consultant, Rehberger Jr. met with Dikenoski and instructed Dikenoski to not offer any sort of inducement whatsoever to any establishment while acting as a sales consultant for LLG.

17. At that meeting, Rehberger Jr. also advised Dikenoski of the payment structure for sales consultants. Pursuant to the terms of the Consulting Agreement, a sales consultant could be paid up to $30,000.00 per use agreement signed by an establishment obtained by the consultant; the payments would be made in the following compensation schedule:

    a. $10,000.00 due to the sales consultant once a signed Use Agreement is presented and application is made to the Illinois Gaming Board;

b. $10,000.00 due to the sales consultant once the location is licensed by the IGB and Lucky Lincoln installs machines into the location;

c. $5,000.00 due to the sales consultant once the location is live with Lucky Lincoln machines for a period of one year; and

d. $5,000.00 due to the sales consultant once the location is live with Lucky Lincoln machines for a period of one year and the location has averaged $30,000.00 NTI for the previous six-month period. **Exhibit A**.

18. While acting as a sales consultant for LLG, Dikensoki obtained four Use Agreements signed by establishments, for Lucky Lincoln videogaming terminals to be installed at each location.

19. Contrary to the instructions of Rehberger Jr. and the terms and conditions of the Consultant Agreement, Dikenoski offered monetary inducements to establishments he helped to obtain.

20. Specifically, upon information and belief, Dikenoski offered establishments $5,000.00 to sign a Use Agreement for LLG machines to be installed at their locations.

21. Upon information and belief, Dikenoski offered inducements to the following locations:

    a) Blerim Alimi LLC d/b/a Mama Mia's

    b) E.B.V. Grab N Go Inc. d/b/a EBV Grab and GO

    c) Jack's 5th Street Inc. d/b/a Jacks 5th Street

    d) NL Enterprises, Inc. d/b/a Country Aire

22. As a result of his work, LLG paid Dikenoski $50,000.00.

23. In late January 2018, after receiving information that LLG sales consultants were offering inducements to owners of certain video gaming locations, IGB investigators interviewed witnesses, including Dikenoski.

4

24. During his interview with IGB investigators, Dikenoski stated that during his first meeting with Rehberger Jr., Dikenoski was told "if it's a good account, we will offer them anything to make it happen."

25. Dikenoski's aforesaid statement to IGB investigators was false.

26. Dikenoski pledged to cooperate with the IGB investigation into LLG and proceeded to provide the IGB with additional information relating to LLG.

27. As a result of the false statements and information Dikenoski provided to IGB agents, the IGB instituted charges against LLG for violating the Video Gaming Act and Gaming Board's rules.

28. Due to these new charges against LLG, the IGB sought revocation of LLG's terminal operator gaming license.

29. LLG was not aware Dikenoski had made any monetary inducement offers to establishments until receiving the IGB filed inducement charges against the company.

30. On or about March 26, 2018, Rehberger Jr. and Dikenoski met to discuss the IGB charges pertaining to Dikenoski's conduct. During that meeting, Dikenoski acknowledged that Rehberger Jr. had expressly instructed him not to offer inducements to videogaming establishments. Furthermore, Dikenoski agreed to provide a written statement to memorialize Rehberger Jr.'s no-inducement instruction from December 2017 to send to the IGB. Rehberger Jr. sent Dikenoski a proposed written statement for Dikenoski to sign and return.

31. During their conversation of March 26, 2018, Dikenoski denied ever making any inducement offers while working as a LLG sales consultant.

32. In that same March 2018 meeting, Dikenoski informed Rehberger Jr. that he had several other locations he could get to sign Use Agreements with LLG.

33. By May 2018, Dikenoski was no longer working as a sales consultant for LLG.

5

34. After the March 2018 meeting, neither Rehberger Jr., nor any LLG representative, had contact with Dikenoski for thirteen months.

35. After the meeting of March 2018 between Rehberger, Jr. and Dikenoski, LLG, in reliance on Dikenoski's statements in the March 2018 meeting, believed that Dikenoski did not, in fact, offer inducements to establishments.

36. In October 2019, Rehberger Jr. had a telephone conversation with Dikenoski to follow up on Dikenoski's agreement to send LLG a signed written statement for submission to the IGB. During the conversation, Dikenoski admitted to Rehberger Jr. for the first time that Dikenoski had, in fact, offered inducements to videogaming locations.

37. During the October 2019 conversation, Dikenoski also informed Rehberger Jr. that he was now unwilling to sign any written statement and requested that Rehberger Jr. never contact Dikenoski again. Since that telephone conversation, Rehberger Jr. has not spoken to or contacted Dikenoski.

38. As a result of Dikenoski's statements to Rehberger, Jr. in March 2018, Dikenoski fraudulently concealed his tortious and improper conduct from LLG until October 2019.

39. Fatmir Dikenoski breached the terms and conditions of his Consultant Agreement with LLLG by offering monetary inducements to establishments.

40. Not only did Dikenoski fail to meet the terms and conditions of his Consultant Agreement by offering inducements, Dikenoski also lied to LLG by denying the allegation that Dikenoski offered monetary inducements to establishments, which impaired LLG's ability to remedy the damage Dikenoski caused.

41. In Illinois, the video gaming industry is highly competitive whereby video gaming terminal operators aggressively compete with other terminal operators by attracting establishments to sign Use Agreements for their machines to be installed in their location.

42. The inducement charges filed against LLG were widely reported and widely discussed throughout the Illinois video gaming industry including both competitor terminal operators and locations.

43. Several of LLG's competitors used the inducement charges against LLG to entice establishments to switch their video gaming terminal operator away from LLG.

44. As a result of Dikenoski's breach and the resulting IGB charges, numerous establishments dropped LLG as their terminal operator and entered into Use Agreements with LLG's competitors.

45. As a result of Dikenoski's breach and the resulting IGB charges, LLG lost potential Use Agreements with establishments who instead signed Use Agreements with LLG's competitors.

46. As a result of Dikenoski's breach, LLG suffered the loss of numerous video gaming establishment clients and the loss of millions of dollars of revenue.

47. As a result of Dikenoski's breach LLG's reputation was severely damaged in the video gaming industry in Illinois, and administrative proceedings with the IGB that have been ongoing for over five years.

48. As a result of Dikenoski's breach, LLG has incurred legal expenses to defend itself against IGB's inducement charges in an amount in excess of $250,000.00.

## COUNT I
## BREACH OF CONTRACT

49. Plaintiff re-alleges the allegations set forth in Paragraphs 1 through 48 above and incorporates same herein by reference.

50. At all times relevant to this litigation, Defendant Fatmir Dikenoski was in a contractual relationship with LLG.

51. Under the terms and conditions of the executed Consultant Agreement, Dikenoski agreed to not offer inducements to video gaming establishments in an effort to wrongfully persuade and induce businesses to sign Use Agreements with LLG.

52. Defendant Dikenoski materially breached that condition of the Consultant Agreement by offering monetary inducements to four establishments to induce each establishment to sign Use Agreements with LLG.

53. Such acts were the actual and proximate cause of harm to LLG.

54. Defendant Dikenoski's conduct was outrageous, with his acts being done with malice or bad motives or reckless indifference to the interests of LLG.

55. Defendant Dikenoski is liable in damages to LLG in excess of $75,000.00, the exact amount to be proven at trial.

56. LLG has sustained diminished equity value in an amount to be determined at trial.

57. Pursuant to the Consultant Agreement, LLG is entitled to attorneys' fees incurred by it in this litigation in the event LLG prevails.

WHEREFORE, Plaintiff, LLG, respectfully requests that this Honorable Court enter judgment in favor of LLG and against Fatmir Dikenoski in an amount to be determined at a trial in this matter, and any and all further relief this Court deems fair and just.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACT

58. LLG realleges Paragraphs 1 through 57 as if fully stated herein.

8

59. The Use Agreements between LLG and the following video gaming establishments were terminated by the establishment as a result of Dikenoski's conduct in causing the IGB to bring charges against Lucky Lincoln:

 a. Big River Gaming, LLC – Colona d/b/a Vega's (License No. 170702834)
 b. BIG RIVER GAMING LLC – Milan (License No. 170702823)
 c. Side Rhodes, Inc. – d/b/a Time Out Sports Bar (License No. 120709000)
 d. Caseyville BP INC. (License No. 140704255)
 e. HI-WAY RESTAURANT, INC. (License No. 180702653)
 f. Hot Spot Restaurant (License No. 140702448)
 g. Hot Spot Restaurant (License No. 140702324)
 h. D.E.B., Inc. – d/b/a Bocce's Bar & Grill (License No. 120711481)

60. Dikenoski was aware that LLG had contracts in place with many video gaming establishments throughout the State of Illinois.

61. As a sales consultant of LLG, Defendant Fatmir Dikenoski was aware of the Use Agreements between Lucky Lincoln and the seventeen video gaming establishments above-mentioned in paragraph 59.

62. Dikenoski was further aware that any damage to the company's reputation could result in video gaming establishments under contract with LLG to replace LLG with a competitor.

63. Dikenoski intentionally interfered with the Use Agreements by and among other things, offering monetary inducements to establishments to sign Use Agreements with LLG, which directly resulted in the IGB inducement charges against LLG.

64. Dikenoski's conduct is the proximate cause of damages that have and will incur LLG in the form of lost profits, lost equity and other amounts to be determined at trial.

65. From the time of Dikenoski's interference to the present date, LLG estimates that it lost approximately $6,183,876.00 in revenue from the seventeen establishments above-mentioned in paragraph 59 which terminated their Use Agreements as a result of Dikenoski's misconduct.

WHEREFORE, Plaintiff, LLG, respectfully requests that this Honorable Court enter judgment in favor of LLG and against Fatmir Dikenoski in an amount to be determined at a trial in this matter, and any and all further relief the Court deems fair and just.

## COUNT III
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

66. LLG realleges Paragraphs 1 through 65 as if fully stated herein.

67. LLG had a reasonable expectation of entering into a valid business relationship with Blerim Alimi LLC d/b/a Mama Mia's, E.B.V. Grab N Go Inc. d/b/a EBV Grab and GO, Jack's 5th Street Inc. d/b/a Jacks 5th Street, and NL Enterprises, Inc. d/b/a Country Aire by entering into Use Agreements with LLG, with LLG acting as the terminal operator for each establishment.

68. LLG had a reasonable expectation of entering into a valid business relationship with other establishments throughout the State seeking a Terminal Operator to provide video gaming services.

69. Specifically, LLG would have entered into a valid business relationship with, at least, the following eight video gaming locations if not for Dikenoski's interference:

 a. Demma's Lounge (License No. 120707554)
 b. 219 SPORTS BAR L.L.C. (License No. 120708201)
 c. O'Leary's Pub & Grub, Inc. (License No. 120711378)
 d. LAKE VILLA POST 4308 (License No. 130701803)
 e. BEZAK ENTERPRISES INC. (License No. 130706457)
 f. Midwest Estimator LLC (License No. 160704058)
 g. ROUTE 3 BAR & GRILL LLC (License No. 170700575)
 h. Johnny's Chophouse, LLC (License No. 180701007)
 i. ROUTE 3 HUT, LLC (License No. 220701600)
 j. ELMHURST ELKS LODGE #1531 (License No. 220802027)
 k. JOYFUL SLOTS INC. (License No. 230700254)
 l. NEW BADEN MOTO (License No. 230700282)

70. Fatmir Dikenoski, as a sales consultant, knew of this reasonable expectancy.

71. Dikenoski unjustifiably and maliciously interfered, preventing LLG's expectation from ripening into a valid business relationship with such establishments seeking video gaming operations at their locations.

72. Dikenoski unjustifiably and maliciously interfered, preventing LLG's expectancy from ripening into a valid business relationship with other prospective locations who entered into Use Agreements with LLG's competitors as a result of the IGB inducement charges.

73. Dikenoski's interference was done purposefully, preventing LLG's legitimate expectancy from ripening into valid business relationships.

74. Dikenoski's conduct was intentional, and his interference was done willfully and recklessly, such that any Use Agreement entered into because of cash inducements would ultimately fail.

75. LLG has sustained damages resulting from this malicious, willful, or grossly negligent interference and these damages continue to mount.

WHEREFORE, Plaintiff, LLG, respectfully requests that this Honorable Court enter judgment in favor of LLG and against Fatmir Dikenoski in an amount to be determined at a trial in this matter, and any and all further relief the Court deems fair and just.

### JURY DEMAND

76. Plaintiff exercises its right to a trial by jury as to all such claims so triable.

Respectfully submitted,

**LUCKY LINCOLN GAMING, LLC**

By: /s/ *Michael J. McGrath*
One of its attorneys

Michael J. McGrath (ARDC 6229820)
**ODELSON, MURPHEY, FRAZIER & McGRATH, LTD.**
3318 West 95th Street
Evergreen Park, IL 60805
Ph: (708) 424-5678
mmcgrath@omfmlaw.com